Page 14-5487, Janet Jones, Turner, et al. v. Yellow Enterprise Systems LLC, et al. The oral argument is received 15 minutes before time. Mr. Jones will respond. Take your time. Good morning. May it please the court. My name is Larry Jones. I've reserved two minutes for rebuttal time. Your Honor, I requested oral argument in this case because I wanted to focus the court's attention on this notion of a fail-safe class definition that Judge Simpson decided to not certify the Rule 23 class action below based upon the class definition. To remind the court, a fail-safe class definition is one that some courts have said heads I win, tails you lose. It's one that courts have said that an adverse judgment doesn't bind non-class members because there is some sort of reference in the class definition to the legal basis for the claims. This court in Randleman adopted for the first time the fail-safe notion in the Sixth Circuit. The Seventh Circuit has also recognized the fail-safe notion but has qualified it in the sense that the Seventh Circuit has suggested that the class definition is something that should be fixed at the district court level. The Fifth and Ninth Circuits have rejected the fail-safe class doctrine. In this case, would the class definition really shield absent class members from adverse judgment? To be in this particular class, in this case, an employee must have not been paid for all hours worked or overtime for work in excess of 40 hours pursuant to Kentucky law, must not have been granted meal breaks in accordance with Kentucky law, must not have been granted rest breaks in accordance with Kentucky law, and must have been subject to the automatic pay deductions. So hypothetically, if the class is defined as proposed by the plaintiffs in the district court, if that case was tried and the plaintiffs lose, what claims would the absent class members really have? Unless they opt out of the class, say Judge Simpson would have certified that class, unless they opt out, intellectually, I don't see how they can come back later on and say, I claim that I wasn't paid for 40 hours a week, I wasn't granted meal breaks. I just don't see how they can claim that they weren't part of the class without their claims being barred. And then, as one's drafting a class definition, my biggest problem with the fail-safe notion is that there's no clear guidance out there for litigants or for lawyers. For instance, in this case, Judge Simpson decided not to certify the class because the definition was fail-safe. And then in the plaintiff's brief, we suggested that the court could modify it by taking out the references to Kentucky law. And Judge Simpson said, well that would be over-broad. It really is. And to have such a draconian rule that if you walk into this fail-safe trap, you're just done, that doesn't seem to serve justice. So what I would prefer to see from this court, regardless of what you decide to do in this case, I think that it's important to give litigants and lawyers guidance about what exactly are the courts looking for. Because what we've seen, even after Randleman and Young, is some courts allow very broad definitions to go through. Others allow definitions to go through that seem to fit the fail-safe notion. And so this hasn't provided any sort of bright line for litigants, as I think that they should have. I don't think that this should be something, you know, class actions, if you go back to the policy, they're intended to provide people who have claims that individually aren't worth much to collectively come together and bring an action. So these are very important to society, to the justice system. Yes, Your Honor? Does the court even get there if it doesn't address the merits of the summary judgment action? Does the court get where? To worrying about the class certification and all of that. Well, the court in this case made the class action determination first, and then once, and the collective action decertification, and then moved to summary judgment, you know, later on for the individual plaintiffs who were left. It would be our position that, you know, a class action, a court should be dealing with these issues as early as practical and certify the class or not. Maybe I'm missing something totally. Sure, sure. And if I am, say so. But it seems to me the individual plaintiffs lost. Yes. So what's to worry about relative to the, what happened to the class, the Rule 23, and all that issues? Where's, I guess, ultimately the case of controversy, why should, I may be missing something, okay? And by all means, tell me. No, Your Honor, you're right. There was a summary judgment, and that's part of this appeal as well. Right. Judge Simpson, on the individual claims, he found that because there was a policy in the handbook that said these employees should submit missed lunch slips, that their claims were barred. Our position is that you can't waive your FLSA claims or your state law claims. There were instances, weren't there, at least alleged, and I think perhaps in the proof, that because of the work demands, there were employees who wound up having no lunch break, but because they failed to submit the slip, they didn't get compensated. But on the other hand, if I understand correctly, a manager looked at all the time cards, and would that time card have indicated on its face whether I had a lunch break or not? Yes, Your Honor. And how can then the company contend, well, it wasn't on notice of whether or not somebody had a lunch break and were otherwise in compliance with FLSA? Right, Your Honor, I agree. There was something called crew logs that Yellow had in their possession, and it would show all of that. And actually looked at them. Yes, so they would look at them whenever someone would submit a missed lunch slip. Only when the slip came in. I can't say for certain that only... At the impression that it was kind of a routine... Well, it would be my understanding that someone was looking at these routinely. Well, is there any evidence to that effect? I mean, your understanding is not evidence. I mean, just because they have the capability of reviewing the crew logs doesn't mean that they have knowledge of the facts contained in there. And that's kind of the problem I have with the argument. Well, there is evidence that they actually reviewed these. Every day, every... Well, I think... Only to substantiate when there is a slip submitted. I think that that's probably true. Whenever a slip was submitted, they would go through the crew logs. When they're saying we have a reasonable policy to submit a slip, and we have a right to enforce that reasonable policy, and then we also have a right to substantiate it, we'll go to the crew logs to see if it's substantiated at that point. Your Honor... It doesn't mean I have no obligation to file the policy, and I don't have to submit the slip anymore, because they have an alternative means to determine whether I should have submitted the slip. I mean, it's kind of a precondition of the policy. Sure. There's evidence that these employees would submit the slips, and then they weren't getting paid for their... So they began to think that it was a fetal practice. Okay. And if that were true, you know, I would like to know the specific instances where that occurred. It seems to me like the examples are very general in nature and nonspecific, and, you know, I can't... In general, I know there have been a couple times I submitted slips and I didn't get paid, but I don't remember when they were, and I don't have proof of it, and I don't know if that's sufficient to create a genuine issue of material fact. Well, I think the crew logs themselves are the best evidence of the missed lunch breaks. I mean, the crew logs, just a cursory flip through them, I mean, there are... I do think that the problem here is, and that's why I was asking, and I may have misread the briefs. I thought, my recollection was, that the supervisor, I can't remember her name, actually was looking at each one, which I think would create a different circumstance if she looked at it only when the slip was submitted, because I do agree with Judge Griffin that at some point when you're told if you want the benefit, you have to raise your hand, and the fact that anecdotally or... This whole idea, while I thought it was futile, I'm sorry, that doesn't cut it with me. Unless there's a record. I submitted, last year I submitted 17 lunch slips. Here's my record. I got paid once. They got to practice. That's different if you've got that kind of hard evidence, which I don't think is in this record. At some point, people have to follow the process that's there to obtain the benefit. So anyway, but again, one more time. It just seems to me that all this discussion about whether the class should or should not have been certified or how it should have been defined is moot, because the case was dismissed. Or, again, am I missing something? No, I think you're right. I think that if the court affirms the summary judgment, it does moot the class issue for these individual plaintiffs, of course. But I think that I understand what the court's saying about raising your hand and asking for the benefits. I do think that the record reflects that people raised their hand, asked for the benefits, didn't get them. There's also a problem with, I mean, an admitted policy by Yellow of, you know, Kentucky law requires a meal break between the third and fifth hours of the day. Well, five hours are up, and there were cases where that didn't happen, correct? Yes, there were lots of, and Yellow admitted by deposition testimony, they didn't even know that was the law. And most certainly that wasn't their policy to give those meal breaks between hours three and five. You know, that should create a genuine issue of material fact, you know, alone on that issue. Not to mention they admitted that, you know, they knew that there was a problem. You know, based off, they monitored the radio transmissions. They knew that people weren't getting their lunches. They knew that they had heavy call volume. This is a private ambulance company that had less than 5% emergency runs. You know, this was a situation where they could have scheduled things out so that people could get breaks, and they didn't do that. I see that my time is up. Do you have any questions, Ryan? Apparently not. Thank you very much, Mr. Jones. May it please the Court. My name is Mitzi Weirich, and I represent the appellees in this action. To begin with, I'll address some of the Court's questions regarding the policy that was in place and the way that the plaintiffs followed it or, in some instances, didn't follow it. Since 1999, Yellow Ambulance has had a policy in place prescribing exactly how an individual who misses a lunch break can be compensated for that. They posted this policy at the time clock. They put it in the employee handbook. It's in the time card rules. It's in the standard operating procedures. Employees are trained about it on orientation. It's not a mystery to anybody, and in fact, this procedure is widely followed at the company. The way this process actually worked, if someone missed a lunch, they could turn in the reforms called missed time slips. They could write no 10-5, which was the code for lunch, no lunch, missed lunch, whatever, and turn it into the administrative offices. They could also take their actual time card that they punched in and out of the time clock and write the same thing on that and turn that in. Up until 2008, Jan Baker, the administrative director, reviewed the time cards for the EMTs who turned in these time cards saying no lunch. She was also on medical leave for a significant portion of 2008. At that time, the lunch slips were not reviewed and were simply paid. After she left in 2008, again, anything saying no lunch was simply paid. When Ms. Baker was there, she looked not at the time cards, but there were actual run sheets for the ambulances of their runs for the day, and you could look and see where they had been sent and if they had time for lunch. She was simply verifying if someone said they missed a lunch, they were busy, didn't have enough time to take a lunch. Okay, so she looked at the logs if there was a slip submitted. She looked at the run sheets. The run sheets are different from the crew logs, just so you understand that. The crew logs were sheets that were maintained by the dispatchers who were also some of the plaintiffs in this action. The testimony has been undisputed that not only the crew logs are unreliable for a number of reasons. You had EMTs who didn't follow Yellow Ambulance's policy of calling in to request a lunch break. If they didn't call in to request a lunch break and simply took one, Yellow Ambulance would have no record of that on the crew log. Dispatchers testified that they were busy, and didn't always note when someone had a lunch on the crew log. So you had not only people not calling in, you had people not recording it. And ultimately because of that, at some point in this litigation, they didn't even try to maintain a record of whether someone had a lunch on the crew log. So the crew logs are simply not an accurate representation of whether someone had a lunch or not. Is the run sheet an accurate reflection of whether they did or not? The fact that there's a gap of time in there, that doesn't indicate whether they may have been. . . You kind of have to put the two together. You have to take the time card and compare it with the run sheet. And at some point in 2008, they stopped even doing that and were simply paying everybody who said they didn't get a lunch. And as a practical matter, when we questioned each of the appellants in this matter about their practice of following the policy or not following the policy, they all admitted that they had, in fact, followed the policy at times and had, in fact, been paid for lunches. So it strikes me as odd that they claim that it was now futile to request payment for a missed lunch. But that's what they're doing in this litigation. But the record, the voluminous record in this case, reflects that Yellow Ambulance paid hundreds if not thousands of missed lunch flips over the course of time that's at issue here and that the vast majority of the lunches that the plaintiffs themselves requested were paid. So to follow up on your point, I do think that it is maybe irrelevant to get to the class issue because I think that the district court correctly concluded that the defendants were entitled to summary judgment on the meal break claims. Does the record also reflect, though, that there were plaintiffs who missed lunch and were not paid? Isn't there some indication in the record that the company knew, whether it was Jan Baker or someone else, that there were plaintiffs who were missing lunch and just not getting compensated? I don't believe the record reflects that anybody missed a lunch entirely and was not paid. I think there were instances where Ms. Baker reviewed a run log and determined that this person was on standby for not taking a run for 2 to 3 hours or 45 minutes or whatever, had time to get a lunch, and didn't do so. But the vast majority of these missed lunch flips were paid by Yellow Ambulance. I gather that's part of the reason for the requirement, if you missed lunch, tell us about it. Exactly. Instead of letting us try to, as I was talking about earlier, go through your sheets, oops, there's somebody who worked longer, apparently, but the sheet may not be reliable, whether it's a run sheet or the crew log, and trying to penetrate this sort of opaque record, well, let's leave it up to the individual. I missed lunch, take a look at either or both, make a mind up, and move on down the road. Exactly. And the individuals in this case are in the best position to know whether or not they got a lunch. They're the ones in the field, and they're the ones who may or may not be calling in to request a lunch. They're the ones who know what they were doing. Exactly. And I think this court's precedent in both White and Fry, which are squarely on all fours with this case, in those cases the employer had in place a reasonable process to allow an employee who missed a lunch break to request a lunch, and there, because the employees had failed to follow that process, the court said that they could not recover on their missed meal break claims, and we think the same result should occur here. And to address briefly Mr. Jones's point about class certification and class definition, although we don't believe it's necessary to do so because we believe that the merits will address this issue, the concept of a fail-safe class is not a novel proposition. It's been in the case law from this circuit and others for many, many years, and courts have always looked at the ascertainability of a class as part of determining whether a class can appropriately be certified. Here, the issue with the class that was proposed by the plaintiffs was that it included people who were, I think, not paid overtime, who did not receive rest or meal breaks, or who were not fully compensated for all hours worked. That, by definition, means that you cannot determine who is in the class without making an individualized inquiry into the merits, and that, of course, gets you right back to looking at whether they followed the missed lunch slip policy and whether they submitted those. Mr. Jones has suggested that perhaps if you backed off that definition, which they didn't really do at the district court level, that maybe he's trying to walk a fine line between a rock and a hard place, but I would submit that there are cases where a class is just simply not appropriate, and the reason a class definition cannot be come up with either by the plaintiffs or by the court is because of the circumstances of that particular case. And here, it's impossible to determine who is in the class without doing an individualized inquiry because you'd be looking at the meal break policy, whether it's followed, whether they had been paid, and what ultimately happened there as part of your determination on the meal break class. Even if you got past the fail-safe definition aspect of it, Judge Simpson didn't stop there. He went on and found that the class was not appropriate under B-1 or B-2. The plaintiffs there had sought injunctive relief, and here all of the plaintiffs are former employees of Yellow Ambulance. They really don't have standing to seek injunctive relief or to seek any changes in the policies of Yellow Ambulance. So we would submit that a class would not be appropriate. The plaintiffs also argue, as I recall, that the district court abused its discretion in the decertification aspect of this and not following this O'Brien case, this circuit case, essentially applying a far more stringent test than would be required. How do you respond? The plaintiffs did make that argument, and I don't believe that they actually applied a more stringent argument. They were talking about the O'Brien case in which the court said that the court ultimately decertified the class there because of the circumstances, but they posited that there was potentially a collective action there because it was a common theory of violations. The Fry case, which is subsequent to the O'Brien case, followed that and decertified a collective action, again on the basis that the plaintiffs failed to follow a policy for reporting missed meal breaks. But if you read O'Brien as expansively as the appellants would have you in this case, I think it would be very difficult to find a case where a collective action would not be decertified. All you have to do is a common theory. But Comer and even O'Brien talks about the decertification process as being a two-step process, and after extensive discovery you're supposed to look at the factual and employment settings of the plaintiffs, the individualized offenses, and the procedural and fairness concerns, and the court did that here. This wasn't a case where the collective action wasn't initially certified, because it was. After that, we had extensive discovery involving a number of depositions, thousands of documents, including all the time cards, run sheets, crew logs, everything of that nature that were reviewed, and all this evidence was before the district court, and the court appropriately concluded after this review that the plaintiffs were not similarly situated. They had been, in fact, paid for their meal breaks and therefore could not have a viable claim along with the members of the other purported class members. Can you talk about the Kentucky state law claims a little bit? The rest break claims? There's a rest break claim and a lunch break claim, isn't there? Yes, the lunch break claim. Let's talk about the rest break. Okay, the rest break claim is only a state law claim, and there the plaintiffs are claiming that they did not receive rest breaks. Here, for the first time in this court, they are arguing that KRS 446.070, which is a statute allowing a person to recover for a violation of another statute, would allow them to recover. They did not plead that below. Below, they only relied on KRS Chapter 337, the Kentucky Wage and Hour Act. KRS Chapter 337 has no private right of action for rest breaks, and I think Thompson v. Kosare, which was decided by Judge Simpson below and affirmed by this court, is clear about that. So if they had a remedy under the other statute, you're saying it just wasn't pleaded? Yes, they did not plead it, and I would say they also don't have a remedy under KRS 337. Even if they did have a claim, however, they admitted that they took breaks. The plaintiffs testified. Two of the plaintiffs here were smokers, took frequent smoke breaks, took smoke breaks every day. Nobody ever complained that they weren't getting breaks. There was no policy not to take breaks. No one ever disciplined anyone for not taking breaks, and there was no record of any missed breaks until this lawsuit. Accordingly, we don't believe that there is any appropriate claim for rest breaks. How about the state law? The state law is very similar. It's actually identical to the federal law. Are there any distinctions between the Kentucky law and the federal law in this regard? Not in terms of compensability of meal breaks. The only, I think, additional issue there is whether a break had to be given between the third and fifth hour of the shift, and the statute very clearly says that there can be a collective bargaining agreement or mutual agreement between the employer and the employee about this, so it's not an ironclad guarantee of a break, and the policies stated that because of the nature of the business, you weren't guaranteed that you would get a lunch break, so by continuing to be employed by Yellow Ambulance after they were aware of this policy, we believe that there's no viable claim. But that gets into the whole issue of whether something stated in a handbook or whatever creates a contractual bilateral commitment where the employee, in effect, waives whatever rights he has under the statute because of the nature of the business, and I think you've got strong arguments. Does Kentucky law allow that? The statute very clearly allows for a mutual agreement between the employer and the employee. A handbook's got to be a unilateral contract, though, isn't it? Well, but if an employee is aware of that and continues to work, and here there's no question. Well, as I say, I think you've got strong arguments. I apologize, Judge. The answer to this question. Okay, I'm sorry. I interrupted your answer. If an employee is aware of that argument, of that policy, and continues to work, I think that you could say it is a mutual agreement. I see that my time is up. Thank you. Just one last question as to those rest breaks. Wasn't there evidence in the record that at least some of the plaintiffs said they had been denied rest breaks or the rest breaks were much less than the 10 minutes they were entitled to, maybe a couple of minutes or something to that effect? I'm not aware of that evidence. I know that the plaintiffs testified that they received breaks. I mean, they testified that they were busy, but I'm not aware of any testimony that they were specifically denied a rest break in any of these three plaintiffs. I thought that Jones-Turner at page ID 341 said she didn't get any rest breaks, and Sherard said maybe two minutes or something like that. But I'll take a look at the record and see how it all fits in. Okay, thank you. Okay, thank you very much. Mr. Jones? Your Honors, we talked a little bit about the employees' obligations to follow these policies and to raise their hand and say I didn't get a lunch break. And as I noted in my brief, Yellow's policy provides that all crews must request approval from the dispatcher for meal breaks with an exact location. You know, if we're going to bind anybody to the policies, to following the policies, it should be the employer. We're talking about remedial statutes here. They had a policy there. You have to call in and get approval for a meal break if you're going to take it. And the fact that not only do their crew logs and their run sheets and all that show that these people weren't taking their lunch breaks, you know, they're dispatchers. I mean, you know, they monitor the traffic. They know what it looks like. And, you know, the nature of the business, that's always frustrated me with this case because, you know, my law firm's busy too. But, you know, I have to schedule people out in order to follow the law. Just because you're busy, just because you're understaffed, doesn't mean that you get to ignore remedial statutes, that you get to push people out of the confines of Kentucky law or federal law and say I can't guarantee you a meal break. I mean, if that were an acceptable excuse, wouldn't all employers just say, you know... I agree with you. I just contracted adhesion and all that and, you know, oversupply of workers, undersupply of jobs, but so forth. But it just seems to me, I'm sorry, but I really have a problem where the record, as far as I can tell, simply does not sufficiently establish a basis for the employee or employees to conclude that it would have been futile. I think that when there is a process and it's there, it's well known, without some history of the inability to benefit from that process, for individual employees to be permitted, which is what I think an opinion in your favor in this case would do, it would send a signal, oh, if you think it's futile, that's enough of a standard to get you to a jury. I'm sorry, I really have a problem with that. And as you can probably tell, I tend to be kind of, I think, pro-employee here. I don't buy her, well, you read the handbook, therefore you're stuck with the 86 pages of stuff. But still, I think when they knew it, some of them practiced it, some of them didn't. At some point, for all we know, the employee said, oh, the hell with it. I'm not going to bother with that, okay? I could have taken a lunch break, I didn't. I got a candy bar, coffee or whatever, that was enough. I mean, we're opening a door, I think, that the law should not open. May I? I'm out of time, but may I address that? Sure. I think if the court looks back to the initial certification hearing for the FLSA, there were several employees that testified about their efforts to submit missed lunch slips and they didn't get paid, and their testimony is that they found it to be futile. I think that that, I understand what Your Honor is saying. The history is there. Judge, go back and read it and you'll find that history. Well, I'm not being, you know, I'm directing the court what to do. What I'm trying to say, though, is while I understand that the very best evidence, the most compelling evidence would be if I were to present some sort of chart to you right now, which we could have done. But I think from an evidentiary standpoint, when you're determining whether there's a genuine issue of material fact, that testimony should be enough. It's more of a proof issue. Jury might believe him, they might not. And does that address? It does. Okay. Thank you. Any other questions? Okay. Thank you, Mr. Jones. Thank you very much. Ms. Weirich, we appreciate your arguments today. The case will be submitted.